UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

ADVANCE MAGAZINE PUBLISHERS INC.
d/b/a CONDÉ NAST,

              Plaintiff,

          -against-

AUBREY DRAKE GRAHAM p/k/a DRAKE,
SHÉYAA BIN ABRAHAM-JOSEPH p/k/a
21 SAVAGE, and HILTZIK STRATEGIES,
LLC,

            Defendants.

-------------------------------------------------------X

No. _____

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

LOEB & LOEB LLP
Wook Hwang
Frank D. D'Angelo
Mary Jean Kim
David Forrest
345 Park Avenue
New York, NY 10154
(212) 407-4000

*Attorneys for Plaintiff Advance Magazine
Publishers Inc. d/b/a Condé Nast*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND .................................................................................................... 4

ARGUMENT ............................................................................................................................. 4

I.    CONDÉ NAST IS LIKELY TO SUCCEED ON ITS TRADEMARK
      INFRINGEMENT CLAIM AND RELATED CLAIMS .............................................. 5

      A.    The VOGUE Mark Is Valid and Protectable ................................................. 5

      B.    There Is, at Minimum, a Likelihood of Consumer Confusion ........................ 7

            1.    The Strength of the Mark ................................................................... 8

            2.    Similarity Between the Marks ............................................................ 9

            3.    Proximity of the Products .................................................................. 9

            4.    Evidence of Actual Confusion ......................................................... 10

            5.    Defendants' Bad Faith ...................................................................... 12

            6.    Sophistication of the Relevant Consumer Group .............................. 15

II.   CONDÉ NAST IS LIKELY TO SUCCEED ON ITS DILUTION CLAIM ................... 16

III.  CONDÉ NAST IS LIKELY TO SUCCEED ON ITS FALSE ADVERTISING
      CLAIM ...................................................................................................................... 18

IV.   CONDÉ NAST IS LIKELY TO SUCCEED ON ITS STATE STATUTORY
      DECEPTIVE BUSINESS PRACTICES AND FALSE ADVERTISING
      CLAIMS .................................................................................................................... 19

V.    CONDÉ NAST WILL SUFFER IRREPARABLE HARM IN THE ABSENCE
      OF AN INJUNCTION ............................................................................................... 20

VI.   THE BALANCE OF EQUITIES TIPS DECIDEDLY IN CONDÉ NAST'S
      FAVOR ...................................................................................................................... 22

VII.  INJUNCTIVE RELIEF IS IN THE PUBLIC INTEREST .......................................... 22

VIII. THE FORM OF INJUNCTIVE RELIEF SOUGHT IS APPROPRIATE ...................... 23

CONCLUSION ........................................................................................................................ 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3M Co. v. Ugly Juice, LLC*,
   No. 5:21-cv-02338-EJD, 2021 U.S. Dist. LEXIS 92473
   (N.D. Cal. May 14, 2021) ................................................................................................17, 19

*ADT Servs. AG v. Hilwey*,
   No. 10-CV-1812-H (WVG), 2010 U.S. Dist. LEXIS 155021
   (S.D. Cal. Nov. 8, 2010) ................................................................................................18

*Advance Magazine Publrs. v. Chic United States*,
   No. 2:20-cv-193-SPC-NPM, 2021 U.S. Dist. LEXIS 31650
   (M.D. Fla. Feb. 2, 2021) ................................................................................................9, 16

*Advance Magazine Publrs. v. Vogue Int'l*,
   123 F. Supp. 2d 790 (D.N.J. 2000) ................................................................................6, 9, 16

*Antetokounmpo v. Costantino*,
   No. 21-CV-2198 (JMF) (JLC), 2021 U.S. Dist. LEXIS 239266
   (S.D.N.Y. Dec. 15, 2021)................................................................................................5

*Antetokounmpo v. Searcy*,
   No. 20-CV-5055 (JGK) (KHP), 2021 U.S. Dist. LEXIS 97197
   (S.D.N.Y. May 20, 2021)................................................................................................15

*Audemars Piguet Holdings S.A. v. Swiss Watch Int'l, Inc*.,
   46 F. Supp. 3d 255 (S.D.N.Y. 2014)................................................................................21

*Bulman v. 2BKCo, Inc*.,
   882 F. Supp. 2d 551 (S.D.N.Y. 2012)................................................................................15, 23

*Burberry Ltd. (UK) v. Burberry-Scarves.com*,
   No. 10 CIV. 9240, 2010 U.S. Dist. LEXIS 147241
   (S.D.N.Y. Dec. 10, 2010)................................................................................................23

*Campbell v. Huertas*,
   No. 20 CV 3471 (KAM) (RML), 2022 U.S. Dist. LEXIS 32960
   (E.D.N.Y. Feb. 22, 2022)................................................................................................15

*Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc*.,
   830 F.2d 1217 (2d Cir. 1987)................................................................................7, 9-10

*Champion v. Moda Operandi, Inc*.,
   561 F. Supp. 3d 419 (S.D.N.Y. 2021)................................................................................9, 16

*Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmbH,*
 843 F.3d 48 (2d Cir. 2016)...............................................................................18, 19

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,*
 598 F.3d 30 (2d Cir. 2010).......................................................................................5

*City of N.Y. v. Blue Rage, Inc.,*
 435 F. Supp. 3d 472 (E.D.N.Y. 2020) ..................................................................7, 8

*Conde Nast Publ'ns v. Vogue Sch. of Fashion Modelling, Inc.,*
 105 F. Supp. 325 (S.D.N.Y. 1952) ...........................................................................9

*Dan-Foam A/S v. Brand Named Beds, LLC,*
 500 F. Supp. 2d 296 (S.D.N.Y. 2007)......................................................................16

*De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate Inc.,*
 440 F. Supp. 2d 249 (S.D.N.Y. 2006) .....................................................................16

*Dish Network L.L.C. v. Siddiqi,*
 No. 18 CV 4397 (VB),  2019 U.S. Dist. LEXIS 193095,
 (S.D.N.Y. Nov. 6, 2019) ........................................................................................ 7-8

*Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.,*
 111 F.3d 993 (2d Cir. 1997).....................................................................................10

*Gayle Martz, Inc. v. Sherpa Pet Grp., LLC,*
 651 F. Supp. 2d 72 (S.D.N.Y. 2009).......................................................................22

*GeigTech E. Bay LLC v. Lutron Elecs. Co.,*
 352 F. Supp. 3d 265 (S.D.N.Y. 2018).......................................................................7

*GTFM, Inc. v. Solid Clothing, Inc.,*
 215 F. Supp. 2d 273 (S.D.N.Y. 2002)................................................................17, 20

*Gucci Am., Inc. v. Duty Free Apparel, Ltd,*
 286 F. Supp. 2d 284 (S.D.N.Y. 2003).......................................................................7

*Guru Teg Holding, Inc. v. Maharaja Farmers Mkt., Inc.,*
 581 F. Supp. 3d 460 (S.D.N.Y. 2022)............................................................. 20-21, 22

*Innovation Ventures, LLC v. Ultimate One Distrib. Corp.,*
 176 F. Supp. 3d 137 (E.D.N.Y. 2016) .......................................................................5

*Juicy Couture, Inc. v. Bella Int'l Ltd.,*
 930 F. Supp. 2d 489 (S.D.N.Y. 2013).................................................................22, 23

*Kelly Toys Holdings, LLC v. Airpods Pro Store*,
  No. 21-cv-8435 (LJL), 2022 U.S. Dist. LEXIS 127149
  (S.D.N.Y. July 18, 2022) ................................................................................................7

*Kraft Gen. Foods, Inc. v. Allied Old English, Inc*.,
  831 F. Supp. 123 (S.D.N.Y. 1993) ...........................................................................13, 17

*Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*,
  192 F.3d 337 (2d Cir. 1999)..........................................................................................5

*Leason Ellis LLP v. Patent & Trademark Agency LLC*,
  No. 13...........................................................................................................................20

*Levitt Corp. v. Levitt*,
  593 F.2d 463 (2d Cir. 1979)..........................................................................................23

*Linotype Co. v. Varityper, Inc*.,
  No. 89 Civ. 4747 (MJL), 1989 U.S. Dist. LEXIS 9105
  (S.D.N.Y. July 31, 1989) ..............................................................................................23

*Local 1814, Int'l Longshoremen's Ass'n v. N.Y. Shipping Ass'n, Inc*.,
  965 F.2d 1224 (2d Cir. 1992)........................................................................................4

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co*.,
  799 F.2d 867 (2d Cir. 1986)........................................................................................8, 10

*Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp*.,
  426 F.3d 532 (2d Cir. 2005)..........................................................................................4

*Microban Prods. Co. v. API Indus., Inc*.,
  No. 14 Civ. 41 (KPF), 2014 U.S. Dist. LEXIS 63883
  (S.D.N.Y. May 8, 2014).................................................................................................21

*N.Y. State Soc'y of Certified Pub. Accountants v. Eric Louis Assocs., Inc*.,
  79 F. Supp. 2d 331 (S.D.N.Y. 1999).......................................................................... 12-13

*N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc*.,
  704 F. Supp. 2d 305 (S.D.N.Y. 2010).............................................................8, 16, 21, 22

*Nabisco, Inc. v. PF Brands, Inc*.,
  50 F. Supp. 2d 188 (S.D.N.Y. 1999)............................................................................21

*NBA Props., Inc. v. YMG, Inc*.,
  No. 93 C 1533, 1993 U.S. Dist. LEXIS 15864
  (N.D. Ill. Nov. 9, 1993).................................................................................................14

*New Kayak Pool Corp. v. R & P Pools, Inc*.,
  246 F.3d 183 (2d Cir. 2001)..........................................................................................8

*Paco Sport, Ltd. v. Paco Rabanne Perfume*s,
No. 00-7344, 2000 U.S. App. LEXIS 29570 (2d Cir. Nov. 16, 2000) ....................................5

*Polaroid Corp. v. Polarad Electronics Corp.*,
287 F.2d 492 (2d Cir. 1961)........................................................................................7, 8, 9, 16

*Rado Watch Co., Ltd. v. ABC Co.*,
92 Civ. 3657 (PKL), 1992 U.S. Dist. LEXIS 8356
(S.D.N.Y. June 8, 1992)....................................................................................................9

*Simon & Schuster v. Dove Audio*,
970 F. Supp. 279 (S.D.N.Y. 1997) ...................................................................................13

*Stutman v. Chem. Bank*,
95 N.Y.2d 24 (2000) .........................................................................................................19

*Sweet People Apparel, Inc. v. Fame of NY, Inc.*,
No. 11-1666 (SRC), 2011 U.S. Dist. LEXIS 78336
(D.N.J. July 19, 2011)......................................................................................................23

*Tecnimed SRL v. Kidz-Med, Inc.*,
763 F. Supp. 2d 395 (S.D.N.Y. 2011)..............................................................................23

*Tiffany & Co. v. Costco Wholesale Corp.*,
127 F. Supp. 3d 241 (S.D.N.Y. 2015)................................................................................8

*Toys "R" Us, Inc. v. Abir*,
No. 97 Civ. 8673 (JGK), 1997 U.S. Dist. LEXIS 22431
(S.D.N.Y. Dec. 19, 1997)..................................................................................................17

*U.S. Polo Ass'n, Inc. v. PRL USA Holdings Inc.*,
800 F. Supp. 2d 515 (S.D.N.Y. 2011)..............................................................................21

*Vans, Inc. v. Mschf Prod. Studio, Inc.*,
No. 22-CV-2156 (WFK) (RML), 2022 U.S. Dist. LEXIS 84740
(E.D.N.Y. Apr. 29, 2022).................................................................................. 12, 15-16, 22

*Virgin Enters. v. Nawab*,
335 F.3d 141 (2d Cir. 2003).................................................................................5, 12, 15

*Yurman Design Inc. v. Diamonds & Time*,
169 F. Supp. 2d 181 (S.D.N.Y. 2001)..............................................................................19

## Statutes And Rules

15 U.S.C. § 1057(b) ................................................................................................................5

15 U.S.C. § 1065 ............................................................................................................6

15 U.S.C. § 1116 ....................................................................................................7, 20, 23

15 U.S.C. § 1125 ..................................................................................................16, 17, 18

15 U.S.C. § 1127 ............................................................................................................7

N.Y. Gen. Bus. Law § 349 ........................................................................................19, 20

N.Y. Gen. Bus. Law § 350 ..............................................................................................20

Fed. R. Civ. P. 65 ............................................................................................................1

Plaintiff Advance Magazine Publishers Inc. d/b/a Condé Nast ("Condé Nast") respectfully submits this memorandum of law in support of its motion, pursuant to Fed. R. Civ. P. 65, for a temporary restraining order and preliminary injunction against Defendants Aubrey Drake Graham p/k/a Drake ("Drake"), Shéyaa Bin Abraham-Joseph p/k/a 21 Savage ("21 Savage") and Hiltzik Strategies, LLC ("Hiltzik"), as set forth in the accompanying proposed Order to Show Cause.

## PRELIMINARY STATEMENT

This motion is brought to enjoin a false, deceptive and far-reaching promotional campaign launched last week by world-famous musical artists Drake and 21 Savage to promote their newly released album *Her Loss* (the "Album"), built entirely on the unauthorized use of Condé Nast's trademarks to *Vogue* magazine (the "VOGUE Mark"), and false representations that Drake and 21 Savage would be featured on *Vogue* magazine's next cover with the "love and support of [*Vogue* magazine] and Anna Wintour" in promoting their soon-to-be-released album. The false statements merely scratch the surface. In furtherance of their deceptive campaign, Defendants created a counterfeit issue of *Vogue* magazine (the "Counterfeit Magazine")—distributing copies in North America's largest metropolitan areas, plastering posters of the counterfeit cover (the "Counterfeit Cover") along streets and buildings, and disseminating images of the Counterfeit Cover to the more than 135 million social media users who actively follow Drake and 21 Savage on social media, along with an untold number of others who have access to the Internet and have viewed these unauthorized uses of the VOGUE Mark in the week since Defendants' deceptive campaign was launched.

All of this was false, and none of it was authorized by Condé Nast. Drake and 21 Savage never appeared on the cover of *Vogue*. *Vogue* magazine and its Editor-in-Chief Anna Wintour had no involvement in the Album or its promotion, nor did they endorse the Album in any way. Nor did Condé Nast authorize, much less support, the creation and widespread dissemination of a

counterfeit issue of *Vogue* nor a counterfeit version of perhaps one of the most carefully curated covers in the entire publication business in service of promoting Defendants' new album.  And, despite Condé Nast's repeated demands that Defendants cease their infringing activities, the infringing content continues to be made available to the consuming public, including via Defendants' social media posts such as the one appearing below, which would take mere seconds to take down:



Injunctive relief is appropriate, and necessary, under these circumstances.  For reasons discussed in more detail herein, Condé Nast is highly likely to succeed on its claims under the Lanham Act (and the related claims under New York law) for trademark infringement, false designation of origin, unfair competition, dilution, and false advertising, as well as on its

independent state law claim for deceptive trade practices.  With respect to the trademark claims, for example, the strength of the VOGUE Mark, acquired through 130 years of continuous use in connection with *Vogue* magazine, is unassailable, as multiple courts have recognized.  The consumer confusion here is not merely a likelihood, but an actuality reflected in the host of press articles issued after Defendants' deceptive campaign was launched, with titles such as *Drake & 21 Savage Land Vogue Cover Ahead Of Collab Album 'Her Loss'*, *Drake and 21 Savage are Vogue's new cover stars*, and *Drake & 21 Savage Make History On The Cover Of 'Vogue'*.  As one outlet mistakenly reported, "The accompanying [*Vogue*] cover story has yet to be released, but when it is, you can rest assured it will be loaded with all kinds of juicy information about the prolific rhymers and their work—both past, present, and future."  Countless user comments on social media and other online forums echo this confusion (*e.g.*, "Looking forward to picking this one up! @voguemagazine"; "It's real. Also magazines can have multiple covers"; "Excited to read what they say about the project").

Following passage of the Trademark Modernization Act of 2020, irreparable harm is presumed upon a finding of likelihood of success.  Even ignoring this presumption, there is no question that Condé Nast will be irreparably harmed absent injunctive relief through the continued deprivation of control over the use of the VOGUE Mark—one of the most recognized in the world. The law is settled in this regard.  And there is no question that the balance of equities and the public interest militate in favor of injunctive relief here—most obviously, based upon the public's interest in not being deceived.

For these reasons and others, temporary and preliminary injunctive relief should be granted (i) enjoining Defendants from disseminating any copies or images of the Counterfeit Magazine or Counterfeit Cover; (ii) making any further use of the VOGUE Mark, or the name, image and

likeness of *Vogue*'s Editor-in-Chief Ms. Wintour, for commercial purposes, including, without limitation, to promote their Album; (iii) enjoining Defendants from making or disseminating any false or misleading statements or misrepresentations concerning the Counterfeit Magazine, the Counterfeit Cover and/or Defendants' participation or appearance in *Vogue* magazine; and (iv) directing the take down of all offending social media posts, and the removal of all copies of the Counterfeit Magazine and of the print posters depicting the Counterfeit Cover from public display and circulation.

## FACTUAL BACKGROUND

The facts applicable to this motion are set forth in the Complaint, the accompanying Declaration of Christiane Mack ("Mack Decl.") with exhibits thereto, the accompanying Declaration of Christopher Donnellan ("Donnellan Decl.") with exhibits thereto, and the accompanying Declaration of Wook Hwang ("Hwang Decl.") with exhibits thereto, all of which are incorporated by reference herein.

## ARGUMENT

"To obtain a preliminary injunction, a plaintiff must establish: '(1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly' in its favor.'" *Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 537 (2d Cir. 2005) (citation omitted). The "standards which govern consideration of an application for a temporary restraining order… are the same standards as those which govern a preliminary injunction … ." *Local 1814, Int'l Longshoremen's Ass'n v. N.Y. Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992). A court may also grant preliminary relief "in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where

4

the costs outweigh the benefits of not granting the injunction." *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).  As detailed below, Condé Nast easily meets this standard.

## I.    CONDÉ NAST IS LIKELY TO SUCCEED ON ITS TRADEMARK INFRINGEMENT CLAIM AND RELATED CLAIMS

In assessing claims for trademark infringement, courts "look[ ] first to whether the plaintiff's mark is entitled to protection, and second to whether defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods." *Virgin Enters. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003).  Condé Nast's claim for false designation of origin/unfair competition under the Lanham Act (Second Claim), as well as the New York statutory and common law trademark infringement/unfair competition claims (Fifth and Sixth Claims), turn on essentially the same showing.  *See, e.g.*, *id.*; *Antetokounmpo v. Costantino*, No. 21-CV-2198 (JMF) (JLC), 2021 U.S. Dist. LEXIS 239266, at *8-9 (S.D.N.Y. Dec. 15, 2021); *Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, 176 F. Supp. 3d 137, 157-58 (E.D.N.Y. 2016).

### A.    <u>The VOGUE Mark Is Valid and Protectable</u>

There is no question that the VOGUE Mark is protectable.

<u>First</u>, Condé Nast's registrations are *prima facie* evidence of the validity, ownership, and exclusive right by Condé Nast to use the VOGUE Mark.  *See* 15 U.S.C. § 1057(b); *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 345 (2d Cir. 1999).  The VOGUE Mark has become incontestable by virtue of its longstanding registrations and is thus "conclusively presumed to be valid and entitled to protection."  *Paco Sport, Ltd. v. Paco Rabanne Perfume*s, No. 00-7344, 2000 U.S. App. LEXIS 29570, at *5 (2d Cir. Nov. 16, 2000); 15 U.S.C. § 1065; Donnellan Decl. ¶¶ 6-7, Ex. 1.

<u>Second</u>, as most of the public knows, the VOGUE Mark is universally recognized as among the world's most famous and distinctive, and is thus protectable on that basis. *See, e.g.*, *Advance Magazine Publrs. v. Vogue Int'l*, 123 F. Supp. 2d 790, 799 (D.N.J. 2000) ("The Vogue Trademarks, and in particular the term 'Vogue' as applied to fashion, has been used by [Condé Nast] for over a hundred years and are registered trademarks of [Condé Nast]. . . . This Court finds as a matter of law that the Vogue Trademarks are both highly distinctive and famous.").

<u>Third</u>, Condé Nast owns strong rights in the mark as a result of its continuous and exclusive use for several decades and its substantial investment therein. For example:

- *Vogue* launched as a weekly newspaper in 1892 and has been published continuously since then, including internationally following the launch of "British Vogue" in 1916 and, more recently, in other international editions published in France, New Zealand, Australia, Italy, Brazil, Germany, Spain, Singapore, South Korea, Japan, Mexico, Portugal, China, and India.

- There are more than sixty active and valid U.S. registrations for trademarks containing "Vogue," with the earliest dating back to 1908.

- Condé Nast spends tens of millions of dollars each year promoting its business and products featuring the VOGUE Mark, and *Vogue* generates tens to hundreds of millions of dollars annually in gross advertising revenue and gross consumer revenue (which includes digital subscriptions).

- The United States edition of *Vogue* magazine (in print and digital editions) is read by approximately 9.4 million people, and the various *Vogue*-branded electronic newsletters have over 880,000 unique subscribers.

- Condé Nast uses the VOGUE Mark on social media, such as Twitter, Facebook, Instagram, and Pinterest. Over nine million people "like" and "follow" Condé Nast's Vogue Facebook page; Condé Nast's @voguemagazine Instagram account has over 41 million followers; and its @voguemagazine Twitter account has almost 15 million followers. Vogue is also the number one fashion publisher on Instagram with respect to followers and engagement.

Donnellan Decl. ¶ 5; Mack Decl. ¶¶ 3-4, 6, 17, 21. All of these facts support Condé Nast's ownership of valid and enforceable rights in the VOGUE Mark. *See, e.g.*, *Centaur Commc'ns, Ltd.*

*v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217, 1222 (2d Cir. 1987); *GeigTech E. Bay LLC v. Lutron Elecs. Co.*, 352 F. Supp. 3d 265, 282 (S.D.N.Y. 2018).

**B.**     **There Is, at Minimum, a Likelihood of Consumer Confusion**

Condé Nast is exceedingly likely to succeed in establishing a likelihood of confusion stemming from Defendants' use of the VOGUE Mark.  The likelihood of confusion inquiry turns on the factors set forth in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir. 1961).  However, where, as here, use of a counterfeit mark is at issue, "the court need not undertake a factor-by-factor analysis under *Polaroid* because counterfeits, by their very nature, cause confusion."  *Kelly Toys Holdings, LLC v. Airpods Pro Store*, No. 21-cv-8435 (LJL), 2022 U.S. Dist. LEXIS 127149, at *10-11 (S.D.N.Y. July 18, 2022) (citation and quotation marks omitted); *see City of N.Y. v. Blue Rage, Inc.*, 435 F. Supp. 3d 472, 489 (E.D.N.Y. 2020) ("It is undisputed that Defendants have utilized the exact marks registered by the City. . . . . Given the inherent confusion caused by the use of counterfeit marks, it is unnecessary to perform a step-by-step analysis of each *Polaroid* factor.") (citations omitted); *Gucci Am., Inc. v. Duty Free Apparel, Ltd*, 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003) ("confusing the customer is the whole purpose of creating counterfeit goods").  And there is no question here that the VOGUE Mark as depicted on the Counterfeit Magazine and Counterfeit Cover constitutes a "counterfeit mark" within the meaning of the Lanham Act.  *See* 15 U.S.C. § 1116(d)(1)(B) ("the term 'counterfeit mark' means—(i) a counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed and that is in use"); *id.* § 1127 ("A 'counterfeit' is a spurious mark which is identical with, or substantially indistinguishable from, a registered mark."); *Dish Network L.L.C. v. Siddiqi*, No. 18 CV 4397 (VB),  2019 U.S. Dist. LEXIS 193095, at *9-10 (S.D.N.Y. Nov. 6, 2019); *Tiffany & Co. v. Costco Wholesale Corp.*, 127 F. Supp. 3d 241, 255 (S.D.N.Y. 2015); *see also City of N.Y.*, 435

F. Supp. 3d at 489-90 (holding that use of disclaimer in connection with counterfeit items does not alleviate consumer confusion but rather evinces defendant's intent to capitalize on goodwill of plaintiff's mark, and collecting cases).

For much the same reason—that the use of a counterfeit mark is inherently confusing—a straightforward application of the *Polaroid* factors also demonstrates that the likelihood of confusion is high here.  Those factors are: (1) the strength of the plaintiff's trademarks; (2) the similarity between the parties' trademarks; (3) the competitive proximity of the parties' products in the marketplace; (4) the likelihood that the senior user will bridge the gap, if any, between the products; (5) evidence of actual confusion; (6) the defendant's bad faith; (7) the quality of the defendant's product; and (8) the sophistication of the relevant consumer group. *See Polaroid*, 287 F.2d at 495.  Application of these factors "need not be rigid."  *New Kayak Pool Corp. v. R & P Pools, Inc*., 246 F.3d 183, 185 (2d Cir. 2001).  Although "'no single *Polaroid* factor is determinative,'" "the first three factors are 'perhaps the most significant.'" *N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc*., 704 F. Supp. 2d 305, 341 (S.D.N.Y. 2010) (quoting *Plus Prods. v. Plus Discount Foods, Inc*., 722 F.2d 999, 1004 (2d Cir. 1983) and *Mobil Oil Corp. v. Pegasus Petroleum Corp*., 818 F.2d 254, 258 (2d Cir. 1987)).

### 1.    The Strength of the Mark

In determining the strength of a mark, courts look to both inherent strength and acquired strength, "reflecting the degree of consumer recognition the mark has achieved." *N.Y.C. Triathlon, LLC*, 704 F. Supp. 2d at 333.  By virtue of Condé Nast's trademark registrations, the VOGUE Mark is "presumed to be distinctive and should be afforded the utmost protection."  *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co*., 799 F.2d 867, 871 (2d Cir. 1986).  Even putting that aside, the VOGUE Mark has acquired distinctiveness from being prominently and continuously used for many decades in the fashion industry, *see* Section I.A, *supra*, and courts

have repeatedly found it to be one of the strongest and most distinctive marks worldwide.  *See, e.g.*, *Advance Magazine Publrs. v. Chic United States*, No. 2:20-cv-193-SPC-NPM, 2021 U.S. Dist. LEXIS 31650, at *8-10 (M.D. Fla. Feb. 2, 2021) (permanently enjoining use of mark on the basis that, *inter alia*, "Condé Nast has continuously used the VOGUE mark since at least as early as 1892" and the "VOGUE mark is famous and known in the United States and throughout the world"); *Vogue Int'l*, 123 F. Supp. 2d at 799 ("Vogue Trademarks are both highly distinctive and famous" "as a matter of law"); *Conde Nast Publ'ns v. Vogue Sch. of Fashion Modelling, Inc.*, 105 F. Supp. 325, 331 (S.D.N.Y. 1952) (permanently enjoining use of VOGUE mark on the basis that continued use would "lessen the distinctiveness" thereof); *see also Champion v. Moda Operandi, Inc.*, 561 F. Supp. 3d 419, 426-27 & n.1 (S.D.N.Y. 2021) (noting that *Vogue* "may well be THE world's most famous" fashion magazine) (emphasis in original).  This factor weighs heavily in Condé Nast's favor.

### 2.    Similarity Between the Marks

Defendants employed an exact duplicate of the VOGUE Mark on the Counterfeit Cover and the Counterfeit Magazine.  Donnellan Decl. ¶12.  As a result, this factor strongly favors Condé Nast. *See, e.g., Rado Watch Co., Ltd. v. ABC Co.*, 92 Civ. 3657 (PKL), 1992 U.S. Dist. LEXIS 8356, at *11 (S.D.N.Y. June 8, 1992) (granting injunction where "it is exceedingly difficult, if not impossible, to distinguish the registered RADO marks from the counterfeit RADO marks, even in a side-by-side comparison").

### 3.    Proximity of the Products

In analyzing the third *Polaroid* factor, which the Second Circuit has referred to as "competitive proximity," "the concern is whether it is likely that customers mistakenly will assume either that the junior user's goods somehow are associated with the senior user or are made by the senior user." *Centaur Comm'cns*, 830 F.2d at 1226 (internal quotations omitted).  Because the

Counterfeit Magazine mimicked a genuine *Vogue* issue and was marketed, distributed and distributed as a genuine *Vogue* issue, there is no question that the goods are in close proximity to one another. *See Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1003 (2d Cir. 1997) ("The products are nearly identical and would compete in the same market, supporting the finding of a likelihood of confusion.").

### 4.    Evidence of Actual Confusion

"[I]t is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source." *Lois Sportswear*, 799 F.2d at 875.

Here, however, there has been abundant evidence of actual confusion in the single week since Defendants' campaign was launched. The accompanying declarations reflect repeated instances of consumers and the mainstream press being duped into believing that *Vogue*'s publisher placed Drake and 21 Savage on the magazine's cover to coincide with the Album's release.

For example, several press outlets reported that Drake and 21 Savage would grace *Vogue*'s cover, attributing Drake's original Instagram post as the source of that mistaken reporting:

- **Yahoo! News**[1] posted a Revolt article titled *Drake and 21 Savage land on the cover of 'Vogue'*, erroneously reporting: "**This Friday (Nov. 4), Drake and 21 Savage will unveil their joint album, Her Loss, to the masses. Before that takes place, the chart-topping duo revealed that they've landed on the cover of Vogue's latest issue.**"

---

[1] *See* https://www.yahoo.com/video/drake-21-savage-land-cover-121225115.html?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8&guce_referrer_sig=AQAAAABOaYOGhPbZdCdqNR42OvsMAho4pjfhDKuBYg2jbkXDFaZOvkPmMUbLHsCUgID_5nqmGQOfAs2RZ37R0ptUN98Opcd7osNUOkLanLXj1gzeRcfSdNSCuccF5RWe0BzzY5CGRKIiBJqvm0-F7vLmURxpHw7bwwGX9laXHVALXAft.

- **All Hip Hop**[2] posted an article titled *Drake & 21 Savage Land Vogue Cover Ahead Of Collab Album 'Her Loss'*, erroneously reporting: "**While Drake and 21 Savage delayed the release of their upcoming surprise album** *Her Loss* **earlier this week, the rollout continues with the two rappers appearing on the cover of iconic fashion bible** *Vogue***.**"

- **HipHopDX**[3] posted an article titled *DRAKE & 21 SAVAGE COVER 'VOGUE' MAGAZINE AHEAD OF 'HER LOSS' ALBUM*, erroneously reporting: "**Drake and 21 Savage have covered the latest issue of** *Vogue* **alongside one another as their** *Her Loss* **joint project is set to arrive later this week.  The fashion magazine cover hit stands on Monday (October 31) featuring the pair of rappers draped in black threads with 21 keeping his face covered with his hand.**"

- **View the Vibe**[4] posted an article titled *Drake and 21 Savage are Vogue's new cover stars*, erroneously reporting: "**Drake and 21 Savage's new album** Her Loss **is not the only thing that's coming out this week. The rapper posted that the duo is Vogue's October cover star. …  This special edition of Vogue's October issue will be available at various locations across New York City. … Having the rappers on the cover of Vogue is definitely different for Vogue.**"

- **HotNewHipHop**[5] posted an article titled *Drake & 21 Savage Make History On The Cover Of "Vogue"*, erroneously reporting: "**While they've since confirmed that we'll be hearing the highly anticipated album this coming Friday (November 4), in the meantime, Drizzy [i.e. Drake] has shared the exciting news that he and the Saint Laurent Don will be the ones to grace the cover of the latest issue of** *Vogue***, landing on newsstands today (October 31). … The accompanying cover story has yet to be released, but when it is, you can rest assured it will be loaded with all kinds of juicy information about the prolific rhymers and their work – both past, present, and future.**"

Hwang Decl., Ex. G.

User comments on social media and other online forums echoed this confusion, reflecting the widespread belief that the Counterfeit Magazine was a genuine *Vogue* issue:

- "Looking forward to picking this one up! @voguemagazine"

---

[2] *See* https://allhiphop.com/news/drake-21-savage-land-vogue-cover/.

[3] *See* https://hiphopdx.com/news/drake-21-savage-her-loss-vogue.

[4] *See* https://viewthevibe.com/drake-and-21-savage-are-vogues-new-cover-stars/.

[5] *See* https://www.hotnewhiphop.com/445575-drake-21-savage-make-history-on-the-cover-of-vogue.

- "FINALLY OMG!!! like bffr...A FASHION ICON"

- "Something is telling me this will be a classic"

- "just wait until they talk about the album in the magazine tomorrow and they reflect on features"

- "you think it's gonna sell out before i can get to it tomorrow afternoon?"

- "This project gonna be special. You not covering Vogue for some thrown together tape BS. (One can hope anyway)"

- "Excited to read what they say about the project"

- "It's real. Also magazines can have multiple covers"

Hwang Decl., Exs. B and I.   The Wikipedia page for "List of Vogue (US) cover models" at one time mistakenly listed Drake and 21 Savage as the magazine's cover models.  *Id.*, Ex. H.

These repeated instances of actual confusion weigh heavily in favor of injunctive relief. *See, e.g.*, *Virgin Enters.*, 335 F.3d at 146 ("a showing that a significant number of consumers are likely to be confused about the source of the goods identified by the allegedly infringing mark is generally sufficient to demonstrate both irreparable harm and a likelihood of success on the merits"); *Vans, Inc. v. Mschf Prod. Studio, Inc*., No. 22-CV-2156 (WFK) (RML), 2022 U.S. Dist. LEXIS 84740, at *11-13 (E.D.N.Y. Apr. 29, 2022) (preliminary injunction granted where "[c]onsumers have misunderstood the source of the [infringing articles] as a collaboration between Plaintiffs and Defendant").

### 5.  Defendants' Bad Faith

Where, as here, "the evidence shows that the defendant intentionally copied the plaintiff's mark, likelihood of confusion will be presumed as a matter of law." *N.Y. State Soc'y of Certified Pub. Accountants v. Eric Louis Assocs., Inc.*, 79 F. Supp. 2d 331, 340 (S.D.N.Y. 1999) (citing *Mobil Oil*, 818 F.2d at 258); *Simon & Schuster v. Dove Audio*, 970 F. Supp. 279, 299 (S.D.N.Y.

1997) ("Evidence of intentional copying raises a presumption that a second comer intended to create a confusing similarity of appearance and succeeded.").

That Defendants intentionally copied the VOGUE mark is self-evident.  As an initial matter, Defendants' use of the identical, counterfeit VOGUE Mark in connection with the dissemination of the Counterfeit Cover alone makes clear that they acted with the intent to trade on the goodwill and reputation of Condé Nast and the VOGUE Mark.  *See Kraft Gen. Foods, Inc. v. Allied Old English, Inc.*, 831 F. Supp. 123, 132 (S.D.N.Y. 1993) ("When a company appropriates an identical mark that is well known and has acquired a secondary meaning, an inference can be drawn that the company intends to capitalize on the goodwill and reputation of the mark as well as any confusion that might result concerning the common origin of that mark and the senior user's product.").

Defendants' ill intent in this regard is further underscored by their repeated efforts to convey to the public that the Counterfeit Cover and Counterfeit Magazine were genuine *Vogue* articles, including through social media posts stating that the issue would be "on newsstands tomorrow" and thanking "@voguemagazine and Anna Wintour for the love and support on this historic moment"; the email blast from Hiltzik attaching images of the Counterfeit Cover and announcing, "To celebrate Drake's Vogue cover and his joint album HER LOSS, Street teams will be handing out copies of the magazine Monday Afternoon in select cities across America"; and subsequent social media posts from accounts affiliated with Drake listing various locations across North America where the "Vogue drop" would be available.  Donnellan Decl. ¶ 15, Ex. 2; Hwang Decl. Exs. A, B and E.  These facts, and others, make "the conclusion that [Defendants] wanted the public to identify [their] merchandise with [Condé Nast's] trademarks . . . inescapable."  *NBA*

*Props., Inc. v. YMG, Inc.*, No. 93 C 1533, 1993 U.S. Dist. LEXIS 15864, at *9 (N.D. Ill. Nov. 9, 1993).

       If Defendants' bad faith were somehow not already clear from this conduct, it became clear days later, when, following Condé Nast's demand that Defendants cease their infringing activities, Defendants steadfastly refused to remove the offending posts or take any other remedial measures to curtail further public confusion—and instead pressed ahead with *further* infringement of the VOGUE Mark, including the following image taken from Drake's Instagram account on November 4, a full four days after the first of Condé Nast's many demands for the cessation of Defendants' infringing activity:



Hwang Decl. Ex. K.  Defendants' disregard for Condé Nast's rights simply highlights what was already clear—that they created the Counterfeit Magazine, and disseminated images of the Counterfeit Cover to untold millions of social media users, with the intent to deceive.  *See, e.g.*, *Campbell v. Huertas*, No. 20 CV 3471 (KAM) (RML), 2022 U.S. Dist. LEXIS 32960, at *11-12 (E.D.N.Y. Feb. 22, 2022) (finding bad faith where "defendant did not cooperate with plaintiff after receiving a cease-and-desist letter[,] suggesting that defendant knowingly continued the infringement"); *Antetokounmpo v. Searcy*, No. 20-CV-5055 (JGK) (KHP), 2021 U.S. Dist. LEXIS 97197, at *10-11 (S.D.N.Y. May 20, 2021) (finding bad faith where defendant "continued to sell the products and use Plaintiff's mark even after receiving a cease and desist letter").

### 6. Sophistication of the Relevant Consumer Group

"In considering the sophistication of the relevant purchasers, courts must evaluate the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving attention such purchasers usually give in buying that class of goods." *Bulman v. 2BKCo, Inc*., 882 F. Supp. 2d 551, 563 (S.D.N.Y. 2012) (alteration and internal quotations omitted).  This factor favors Condé Nast because "[r]etail customers . . . are not expected to exercise the same degree of care as professional buyers, who are expected to have greater powers of discrimination."  *Virgin Enters*., 335 F.3d at 151 (citation omitted). Furthermore, as shown by the examples of actual consumer confusion discussed above, most consumers (understandably) exercised little to no diligence before assuming that a magazine with the VOGUE Mark on its cover was approved by and associated with the *Vogue* brand—and it is reasonable for consumers at all sophistication levels to assume such approval and association.  *See Bulman*, 882 F. Supp. 2d at 564; *see also Vans*, 2022 U.S. Dist. LEXIS 84740, at *14 (factor favored plaintiff where defendant "engaged in a broad advertising campaign" for the products at issue in conjunction with a popular music artist  and "[i]t is likely at least some buyers . . .

purchased them as a result of this public campaign").  This factor too, as with all others, favors Condé Nast.[6]

## II.     CONDÉ NAST IS LIKELY TO SUCCEED ON ITS DILUTION CLAIM

Condé Nast is also likely to succeed on the merits of its trademark dilution claim (Third Claim).  To prevail on its dilution claim, Condé Nast must establish that the VOGUE Mark is famous, and that Defendants' conduct is likely to dilute the mark by blurring or tarnishment, "regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury."  15 U.S.C. § 1125(c)(1); *see Dan-Foam A/S v. Brand Named Beds, LLC*, 500 F. Supp. 2d 296, 306-07 & n.87 (S.D.N.Y. 2007).  Here, Defendants cannot dispute that the VOGUE Mark is famous, as several courts have already found.  *See Champion*, 561 F. Supp. 3d at 426-27 & n.1; *Chic United States*, 2021 U.S. Dist. LEXIS 31650, at *9-11; *Vogue Int'l*, 123 F. Supp. 2d at 799; *see also* Mack Decl. ¶¶ 11, 21 (discussing the ubiquitous nature of the VOGUE Mark and the substantial financial investment in same).

Defendants' conduct is also likely to dilute the VOGUE Mark by blurring.  The factors establishing dilution by blurring under § 1125(c)(2)(B) include: (i) the degree of similarity between the mark and the famous mark; (ii) the degree of inherent or acquired distinctiveness of the famous mark; (iii) the extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark; (iv) the degree of recognition of the famous mark; (v) whether the user of the

---

[6] Although the seventh *Polaroid* factor (the quality of the defendant's product) is not addressed herein, the Court need not consider that.  *See De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate Inc.*, 440 F. Supp. 2d 249, 278 (S.D.N.Y. 2006) ("The difference in the quality of the products is one of the less probative factors in a determination of the likelihood of confusion."); *see also N.Y.C. Triathlon*, 704 F. Supp. 2d at 341 ("the absence of certain factors . . . including . . . evidence that an infringer's goods are of inferior quality, does not automatically mean there is no likelihood of confusion").  In this case, however, a review of the Counterfeit Magazine shows it to be of the same print quality as the authentic magazine, further enhancing the confusion that the Counterfeit Magazine is associated with Condé Nast and the *Vogue* brand.

mark intended to create an association with the famous mark; (vi) any actual association between the mark and the famous mark. *See* 15 U.S.C. §§ 1125(c)(1), (c)(2)(B). For the reasons discussed herein, *all* of these factors strongly favor the conclusion that a likelihood of dilution exists. Defendants' use of the counterfeit VOGUE Mark to falsely convey an association with Condé Nast and the *Vogue* brand, if permitted, undoubtedly creates a risk that the VOGUE Mark "will lose its ability to serve as a unique identifier of the plaintiff['s] product[s]"—the very essence of a dilution by blurring claim. *GTFM, Inc. v. Solid Clothing, Inc.*, 215 F. Supp. 2d 273, 301 (S.D.N.Y. 2002) (citation omitted); *see, e.g.*, *Toys "R" Us, Inc. v. Abir*, No. 97 Civ. 8673 (JGK), 1997 U.S. Dist. LEXIS 22431, at *15 (S.D.N.Y. Dec. 19, 1997) ("The plaintiffs have shown dilution for many of the same reasons discussed above with respect to the similarity between their Toys 'R' Us mark and the defendants' 'TOYSAREUS.COM' mark. Further, the plaintiffs have shown dilution because the defendants in this case were also able to eliminate the capacity of the ['R' US] marks to identify and distinguish [the plaintiffs'] goods and services on the Internet.") (citation and internal quotation marks omitted); *Kraft Gen. Foods, Inc.*, 831 F. Supp. at 134-35 ("It is abundantly clear that a plaintiff demonstrates a likelihood of dilution where the products operate in the same markets and the names are similar enough to cause confusion among the purchasing public. . . . The preceding discussion concerning Kraft['s] likelihood of success on its trademark infringement claim applies with equal force to the anti-dilution claim."); *see also 3M Co. v. Ugly Juice, LLC*, No. 5:21-cv-02338-EJD, 2021 U.S. Dist. LEXIS 92473, at *15-16 (N.D. Cal. May 14, 2021) ("3M's products offered under its 3M Marks have been the subject of widespread, unsolicited media coverage and critical acclaim which has also led to commercial success, with annual revenues in the billions of dollars. Because Defendants['] sale of counterfeit products is also likely

to dilute 3M's Marks, the Court finds that 3M has shown a likelihood of success on its claim for

federal trademark dilution.") (citation omitted).

## III.  CONDÉ NAST IS LIKELY TO SUCCEED ON ITS FALSE ADVERTISING CLAIM

Condé Nast is also likely to succeed on its false advertising claim under the Lanham Act

(Fourth Claim).  Section 43(a)(1) of the Lanham Act prohibits false or misleading descriptions or

representations of fact "in commercial advertising or promotion" concerning "the nature,

characteristics, qualities, or geographic origin of . . . goods, services, or commercial activities."

15 U.S.C. § 1125(a)(1)(B).  A plaintiff may establish falsity in two different ways.   First, literal

falsity is established if "the advertisement either makes an express statement that is false or a

statement that is 'false by necessary implication,' meaning that the advertisement's words or

images, considered in context, necessarily and unambiguously imply a false message." *Church &*

*Dwight Co. v. SPD Swiss Precision Diagnostics, GmbH*, 843 F.3d 48, 65 (2d Cir. 2016) (citation

and quotation marks omitted).   Second, "[i]f a message is not literally false, a plaintiff may

nonetheless demonstrate that it is impliedly false if the message leaves an impression on the

listener or viewer that conflicts with reality."  *Id.* (citation and quotation marks omitted).

Defendants' dissemination of the Counterfeit Cover, and the accompanying messages in

regards thereto, easily satisfy both formulations.  Defendants' social media posts sent to scores of

millions of Defendants' followers and members of the general public are literally false by stating

that *Vogue* and Ms. Wintour provided "love and support" to Defendants for their appearance on

the Counterfeit Cover and in the Counterfeit Magazine to promote their Album.  *See Church &*

*Dwight Co.*, 843 F.3d at 65; *see also ADT Servs. AG v. Hilwey*, No. 10-CV-1812-H (WVG), 2010

U.S. Dist. LEXIS 155021, at *5 (S.D. Cal. Nov. 8, 2010) (plaintiffs likely to succeed on false

advertising claim where "statements Plaintiffs allege Defendant made about ADT's relationship

to Security One are literally false—ADT was not bought out by Security One and did not give Security One rights to take over its technical support service").

At minimum, Defendants conveyed the misleading impression to the general public through their social media posts, as well as by plastering print posters of the Counterfeit Cover in major metropolitan areas, that the Counterfeit Cover and Counterfeit Magazine were authentic— "an impression on the listener or viewer" that decidedly "conflicts with reality." *Church & Dwight Co.*, 843 F.3d at 65.  Courts routinely hold that where, as here, the defendant misleads consumers into believing that its commercial activities are authorized or endorsed by the plaintiff, the plaintiff is likely to succeed on its false advertising claim. *See, e.g.*, *3M Co*, 2021 U.S. Dist. LEXIS 92473, at *15-16 (holding that because "Defendants are likely to, and in fact did, deceive reasonable consumers into believing that Defendants were authorized vendors and distributors of 3M products and/or had an association with 3M,"  "3M is likely to succeed on its claim under section 43(a)(1)(B) of the Lanham Act for false advertising"); *Yurman Design Inc. v. Diamonds & Time*, 169 F. Supp. 2d 181, 185-86 (S.D.N.Y. 2001) (finding likelihood of success on section 43(a) claim where the offending advertisements were "likely to confuse consumers into believing that [defendant] D&T is an authorized retailer of DAVID YURMAN jewelry or at least affiliated with [plaintiff] Yurman").

## IV.   CONDÉ NAST IS LIKELY TO SUCCEED ON ITS STATE STATUTORY DECEPTIVE BUSINESS PRACTICES AND FALSE ADVERTISING CLAIMS

Section 349 of the New York General Business Law proscribes "deceptive acts and practices in the conduct of any business, trade or commerce or in the furnishing of any service" in New York.  Plaintiffs asserting a G.B.L. § 349 claim must show that: (1) the defendant engaged in a consumer-oriented act, (2) the consumer-oriented act was misleading in a material way, and (3) plaintiff consequently suffered injury. *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29 (2000).  G.B.L.

§ 350 proscribes "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in [New York] state." N.Y. Gen. Bus. Law § 350. "Substantially the same analysis applies to claims brought under Section 350 as claims brought under Section 349." *Leason Ellis LLP v. Patent & Trademark Agency LLC*, No. 13 CV 2880 (VB), 2014 U.S. Dist. LEXIS 113154, at *16 (S.D.N.Y. July 2, 2014)

The same facts supporting a likelihood of success on the Lanham Act claims support a likelihood of success on Condé Nast's G.B.L. § 349 claim. *See GTFM, Inc. v. Solid Clothing, Inc.*, 215 F. Supp. 2d 273, 301-03 (S.D.N.Y. 2002). There is no legitimate doubt that Defendants' dissemination of the false and deceptive Counterfeit Cover to tens of millions of Defendants' social media followers and the posting of physical posters depicting the Counterfeit Poster throughout the largest U.S. cities, including New York—all to promote sales of their Album—was consumer-oriented, and that this deceptive campaign using the VOGUE Mark without authorization has caused cognizable injury to Condé Nast, the *Vogue* brand, and the public at large.

## V.   CONDÉ NAST WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF AN INJUNCTION

The Trademark Modernization Act of 2020 created a presumption of irreparable harm upon a court's finding of a likelihood of success on the merits, applicable to all of Condé Nast's claims under the Lanham Act asserted in this action. *See* 15 U.S.C. § 1116(a) ("A plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm … upon a finding of likelihood of success on the merits for a violation identified in this subsection in the case of a motion for a preliminary injunction or temporary restraining order … ."). Accordingly, "if (1) the plaintiff establishes that it has a likelihood of success on the merits (that is, it establishes both the validity of its mark and a likelihood of confusion), and (2) the defendant fails to rebut the presumption, the plaintiff satisfies its burden of showing irreparable harm." *Guru Teg Holding,*

*Inc. v. Maharaja Farmers Mkt., Inc.*, 581 F. Supp. 3d 460, 469 (S.D.N.Y. 2022); *see N.Y.C. Triathlon*, 704 F. Supp. 2d at 326 ("A presumption of irreparable harm also flows from a finding of likely dilution."); *Nabisco, Inc. v. PF Brands, Inc.*, 50 F. Supp. 2d 188, 210 (S.D.N.Y. 1999) ("A showing of a likelihood of dilution will automatically establish irreparable harm").

But even without a presumption, the irreparable harm to Condé Nast if preliminary relief is not granted is obvious from the record.  "Irreparable harm exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark . . . because loss of control over one's reputation is neither 'calculable nor precisely compensable.'" *U.S. Polo Ass'n, Inc. v. PRL USA Holdings Inc.*, 800 F. Supp. 2d 515, 540 (S.D.N.Y. 2011) (citation omitted).  To that end, Condé Nast has made continuous, extensive and exclusive use of the VOGUE Mark for well over century, resulting in a tremendous level of goodwill and consumer recognition.  Donnellan Decl. ¶¶ 4-8; Mack Decl. ¶¶ 3-8. It would lose the ability to control that goodwill and consumers' association with its mark if Defendants, and other would-be infringers like Defendants, were permitted to continue their infringing conduct.  In short, Condé Nast will continue to suffer irreparable harm absent an immediate injunction.  *See, e.g., Microban Prods. Co. v. API Indus., Inc.*, No. 14 Civ. 41 (KPF), 2014 U.S. Dist. LEXIS 63883, at *76 (S.D.N.Y. May 8, 2014) ("[H]aving already established that Aluf's continued use of the Microban Marks is likely to cause consumer confusion, and where the potential for damage to Microban's reputation and goodwill is out of its control, Microban has also established that it would suffer an irreparable injury should injunctive relief not issue."); *Audemars Piguet Holdings S.A. v. Swiss Watch Int'l, Inc.*, 46 F. Supp. 3d 255, 287 (S.D.N.Y. 2014) ("[I]n light of the likelihood of confusion between the Royal Oak watch and Defendants' Trimix watches, without a permanent injunction, 'the reputation and goodwill cultivated by [the senior brand] would be out of its hands.'  Because this

harm is 'neither calculable nor precisely compensable,' Plaintiffs will be irreparably harmed by the ongoing likelihood of confusion") (alteration in original; citations omitted); *N.Y.C. Triathlon*, 704 F. Supp. 2d at 343 (finding irreparable harm where defendant "by misappropriating Plaintiff's marks, . . . is not only trading on Plaintiff's earned goodwill but is also taking from Plaintiff the ability to control its reputation and the services offered under its name and mark").

## VI.   THE BALANCE OF EQUITIES TIPS DECIDEDLY IN CONDÉ NAST'S FAVOR

The balance of hardships also tilts decidedly in Condé Nast's favor.  While the harm to Condé Nast from loss of control of the VOGUE Mark is unmistakable, Defendants would suffer *no* cognizable harm merely from being enjoined from continuing their unlawful and infringing activities.  *See, e.g., Guru Teg Holding*, 581 F. Supp. 3d at 475 ("[D]efendants merely argue the balance of the hardships do not tip in plaintiff's favor because the preliminary injunction would force defendants to pay for new signage and advertising.  Whereas the Court has already found a likelihood of success on the merits, it is unnecessary to weigh the balance of the hardships, which, in any event, would certainly tip in plaintiff's favor.").  In this regard, the injunctive relief sought herein is narrowly tailored to the counterfeit and infringing materials at issue and will not preclude Defendants from marketing the Album through any means they deem appropriate that does not violate Condé Nast's rights or otherwise suggest a commercial association with *Vogue*.  Under these circumstances, an injunction is warranted.  *See Vans*, 2022 U.S. Dist. LEXIS 84740, at *23-24; *Gayle Martz, Inc. v. Sherpa Pet Grp., LLC*, 651 F. Supp. 2d 72, 85 (S.D.N.Y. 2009).

## VII.   INJUNCTIVE RELIEF IS IN THE PUBLIC INTEREST

"The Second Circuit has long held that there is a 'strong interest in preventing public confusion.'" *Juicy Couture, Inc. v. Bella Int'l Ltd.*, 930 F. Supp. 2d 489, 505 (S.D.N.Y. 2013) (citation omitted).  Because Condé Nast has established actual consumer confusion and the likelihood that such confusion will continue, granting an injunction will serve the public's strong

interest in avoiding such confusion.  *See id. at* 504; *Bulman*, 882 F. Supp. 566; *Tecnimed SRL v. Kidz-Med, Inc.*, 763 F. Supp. 2d 395, 417 (S.D.N.Y. 2011).

## VIII.   THE FORM OF INJUNCTIVE RELIEF SOUGHT IS APPROPRIATE

Section 44 of the Lanham Act vests courts with the discretion to craft injunctions "according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark … ."  15 U.S.C. § 1116(a).  The Court's broad discretion in fashioning injunctive relief also extends to remedies for false advertising.  *See Linotype Co. v. Varityper, Inc.*, No. 89 Civ. 4747 (MJL), 1989 U.S. Dist. LEXIS 9105, at *7 (S.D.N.Y. July 31, 1989).  "The relief ordered should be oriented toward eliminating the false nature of the . . . offending [advertising] as well as the confusion it engenders in the minds of consumers."  *Id*. (citation omitted); *see Levitt Corp. v. Levitt*, 593 F.2d 463, 469 (2d Cir. 1979) ("it is beyond cavil that a district court sitting in equity may devise a remedy that . . . is necessary to make the injured parties whole").

The injunctive relief that Condé Nast requests is narrowly tailored, seeking only a cessation of Defendants' ongoing infringing conduct and its suggestion of a connection to Conde Nast, *Vogue*, or its Editor-in-Chief, and a directive that Defendants remove the copies of the Counterfeit Magazine and posters of the Counterfeit Cover that Defendants themselves placed (or authorized) for public circulation and display.  This relief falls well short of the injunctive relief available under the Lanham Act, including, for example, the seizure and destruction of offending articles that courts have ordered in similar circumstances.  *See, e.g.*, *Burberry Ltd. (UK) v. Burberry-Scarves.com*, No. 10 CIV. 9240, 2010 U.S. Dist. LEXIS 147241, at *10 (S.D.N.Y. Dec. 10, 2010); *Sweet People Apparel, Inc. v. Fame of NY, Inc.*, No. 11-1666 (SRC), 2011 U.S. Dist. LEXIS 78336, at *15 (D.N.J. July 19, 2011).

## **CONCLUSION**

For the foregoing reasons, Condé Nast respectfully requests that the Court grant the motion for a temporary restraining order and preliminary injunction in its entirety.

Dated:   New York, New York
         November 7, 2022

LOEB & LOEB LLP


By:   _/s/ Wook Hwang_____
      Wook Hwang
      Frank D. D'Angelo
      Mary Jean Kim
      David Forrest
      345 Park Avenue
      New York, NY 10154
      (212) 407-4000

      *Attorneys for Plaintiff Advance Magazine*
      *Publishers Inc. d/b/a Condé Nast*

23113535

24